DEBORAH CONNOR, Chief
D. HUNTER SMITH, Trial Attorney
Money Laundering and Asset Recovery Section
Criminal Division
United States Department of Justice
     1400 New York Avenue NW
     Washington, DC 20005
     Telephone: (202) 355-5705
     Email: David.H.Smith@usdoj.gov

TRACY L. WILKISON
United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
JONATHAN GALATZAN
Assistant United States Attorney
Chief, Asset Forfeiture Section
MAXWELL COLL (Cal. Bar No. 312651)
Assistant United States Attorney
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-1785
     Facsimile: (213) 894-0142
     E-mail: Maxwell.Coll@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>           Plaintiff,<br><br>                v.<br><br>REAL PROPERTY IN LOS ANGELES, CALIFORNIA,<br><br>           Defendant. | No. 2:22-cv-02902<br><br>VERIFIED COMPLAINT FOR FORFEITURE IN REM<br><br>18 U.S.C. §§ 981(a)(1)(A), (B), and (C) |

**VERIFIED COMPLAINT FOR FORFEITURE IN REM**

Plaintiff United States of America, by and through its undersigned attorneys, alleges:

1. This is an action to forfeit a multimillion-dollar mansion located in the Holmby Hills neighborhood of Los Angeles, California (APN 4359-013-027). Title to the real property is in the name of WRH, LLC, which is now known as WRH, Inc.

2. The defendant mansion was involved in, constitutes, is derived from, and is traceable to unlawful bribes paid for the benefit of Gagik Khachatryan ("KHACHATRYAN"), the former minister of finance of the Republic of Armenia, and his sons Gurgen Khachatryan ("GURGEN") and Artyom Khachatryan ("ARTYOM"), and related money-laundering transactions. The mansion is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A), (B), and (C).

**PARTIES, PERSONS, AND ENTITIES**

3. The plaintiff is the United States of America.

4. The defendant in rem is the real property in Los Angeles, California described in Exhibit A and all appurtenances, improvements, and attachments thereon, as well as leases, rents, and profits derived therefrom (the "Veto Estate").[1]

5. From 2008 to 2016, Gagik KHACHATRYAN served first as the chairman of the State Revenue Committee and later as the minister of finance of the Republic of Armenia. He has been charged with crimes in Armenia, including receiving bribes in violation of Article 311 of the Criminal Code of the Republic of Armenia.

---

[1] Pursuant to Local Rule 5.2-1 of the Local Civil Rules for the Central District of California, the street address of this residential property is not set forth in this Complaint.

2

6. GURGEN and ARTYOM Khachatryan are the adult sons of Gagik KHACHATRYAN. They have each been charged with crimes in Armenia including receiving bribes in violation of Article 311 of the Criminal Code of the Republic of Armenia.

7. Sedrak ARUSTAMYAN ("ARUSTAMYAN") is a prominent businessman in Armenia. He was an executive officer of a consortium of Armenian business entities known as Multi Group. He has been charged in Armenia with paying bribes to KHACHATRYAN in violation of Article 312 of the Criminal Code of the Republic of Armenia.

8. Tadevos T. Khachatrian ("TED") is a relative of KHACHATRYAN, GURGEN, and ARTYOM, who resides in Los Angeles, California. TED served as a U.S.-based representative of KHACHATRYAN, GURGEN, and ARTYOM.

9. The Veto Trust is a trust formed under the laws of California by an agreement dated May 11, 2011. The agreement named GURGEN and ARTYOM as trustors and beneficiaries and GURGEN and Abraham Stepanian as the collective trustee. Stepanian resigned as trustee shortly after the trust was formed; TED later replaced him in that role. The Veto Trust purchased the Veto Estate on or around August 5, 2011, with unlawful bribes paid by ARUSTAMYAN.

10. WRH, LLC was a limited liability company formed under the laws of California on or around February 11, 2016. TED served as WRH, LLC's manager. On or around May 15, 2019, WRH, LLC converted into a stock corporation.

11. WRH, Inc. is a California stock corporation formed by the conversion of WRH, LLC on or around May 15, 2019. TED is the chief executive officer, chief financial officer, and secretary of WRH,

Inc.  GURGEN and ARTYOM are the corporation's directors.  WRH, Inc. is the current title holder of the Veto Estate.

12.  The interests of WRH, Inc. may be adversely affected by these proceedings.

## JURISDICTION AND VENUE

13.  This Court has jurisdiction over civil actions commenced by the United States under 28 U.S.C. § 1345 and over forfeiture actions under 28 U.S.C. § 1355(a).

14.  This Court may exercise in rem jurisdiction over the defendant pursuant to 18 U.S.C. § 985(c).

15.  Venue lies in this district pursuant to 28 U.S.C. § 1355(b)(1) because acts or omissions giving rise to the forfeiture occurred in this district.  Venue also lies in this district pursuant to 28 U.S.C. § 1395(b) because the defendant in rem is located in this district.

## BASIS FOR FORFEITURE

**I.   The Corruption Scheme**

16.  Throughout the 1990s and 2000s, KHACHATRYAN held various positions in the tax and customs agencies of the Republic of Armenia.

17.  On August 20, 2008, KHACHATRYAN was appointed chairman of the State Revenue Committee of the Republic of Armenia, the government agency responsible for the assessment and collection of taxes under Armenian law.  He remained in that position until his appointment as minister of finance of the Republic of Armenia.

18.  On April 26, 2014, KHACHATRYAN was appointed minister of finance of the Republic of Armenia.  At or around the same time that KHACHATRYAN became minister of finance, the Ministry of Finance assumed responsibility for the assessment and collection of taxes in

Armenia. Because KHACHATRYAN exercised both the minister of finance's traditional responsibilities as well as responsibilities for tax assessment and collection, he was known as the "Super Minister."

19. KHACHATRYAN remained the minister of finance until on or around September 8, 2016.

20. Sedrak ARUSTAMYAN ("ARUSTAMYAN") was an executive officer or owner of more than 20 Armenian business entities, which were subject to taxation under Armenian law. These entities included Multi Leon; Multi Gaz; Multi Motors Ltd; Magas Invest PB; Shustov Trading House PB; AR-BE Armenian-Belarus Trading House; Araratcement PB; Yerevan's Ararat Cognac-Wine-Vodka Factory; Ecofish Trade Ltd; Raps; Onira Club Ltd; Kotayk Beer Factory Ltd; and Jermuk Turboshin Ltd.

21. While KHACHATRYAN was responsible for tax assessment and collection in Armenia, ARUSTAMYAN made several unlawful payments to KHACHATRYAN and his two sons GURGEN and ARTYOM. ARUSTAMYAN made the payments to secure favorable tax treatment for his business entities.

22. ARUSTAMYAN, GURGEN, and ARTYOM created at least two sham loan agreements to disguise these payments. The loan agreements were shams in that no party expected the underlying loans to be repaid.

23. <u>Loan-1.</u> On or around July 9, 2009, approximately one year after KHACHATRYAN was appointed chairman of the State Revenue Committee of the Republic of Armenia, ARUSTAMYAN entered into a $7,000,000 sham loan agreement ("Loan-1") with GURGEN and ARTYOM. According to the written terms of Loan-1, the loan was due to be paid in full plus 4 percent interest on July 30, 2010. If the loan was

1 not repaid within the specified time, a penalty of 0.01 percent was
2 to be assessed per day.

3     24. On the date of the loan agreement, GURGEN and ARTYOM were
4 approximately 25 and 23 years old, respectively.

5     25. On July 29, 2010, the day before payment on the loan was
6 due, ARUSTAMYAN, GURGEN, and ARTYOM entered into an agreement to
7 extend Loan-1's repayment date to July 30, 2015 ("Amendment-1"). On
8 July 28, 2015, two days before the amended repayment date,
9 ARUSTAMYAN, GURGEN, and ARTYOM entered another agreement to extend
10 the repayment date to July 30, 2019 ("Amendment-2"). ARUSTAMYAN did
11 not charge any penalties or receive any consideration for the
12 extensions of the loan.

13     26. <u>Loan-2.</u> On or around July 10, 2011, ARUSTAMYAN entered
14 into a $13,400,000 sham loan agreement ("Loan-2") with GURGEN and
15 ARTYOM. According to the written terms of Loan-2, the loan was due
16 to be paid in full plus 4 percent interest on July 10, 2016. As with
17 Loan-1, if the loan was not repaid within the specified time, a
18 penalty of 0.01 percent was to be assessed per day. As described
19 below, funds from ARUSTAMYAN corresponding to this loan amount were
20 used to purchase the Veto Estate. Nonetheless, as also described
21 below, ARUSTAMYAN did not obtain a security interest in the Veto
22 Estate.

23     27. On or around July 7, 2016, three days before Loan-2 was to
24 become due, ARUSTAMYAN, GURGEN, and ARTYOM entered into an agreement
25 to extend the repayment date to July 10, 2019 ("Amendment-3"). As
26 before, ARUSTAMYAN did not charge any penalties or receive any
27 consideration for the extension of the loan.

28

28. As of April 24, 2020, ARUSTAMYAN still had not received any payment of principal or interest on either of his supposed loans. Upon information and belief, he has not received any interest or principal payment on either supposed loan to date.

29. In exchange for payments disguised as Loan-1 and Loan-2 and other corrupt payments, KHACHATRYAN illegally used his influence to reduce the tax liabilities of businesses affiliated with ARUSTAMYAN.

30. In 2018 and 2019, after KHACHATRYAN left public office, Armenian tax authorities conducted retrospective tax inspections of several companies for 2015, the last full year in which KHACHATRYAN was minister of finance. The Armenian statute of limitations restricted retrospective inspections for prior years.

31. The retrospective tax inspections found that several of ARUSTAMYAN's companies had significant unpaid tax liabilities that accrued while KHACHATRYAN was responsible for tax collection in Armenia. The unpaid taxes included value-added tax, profit tax, and excise tax.

32. For example, one of ARUSTAMYAN's companies, Araratcement PB, was not subject to a tax inspection between at least 2009 and 2014, even though it appeared on the list of companies that was supposed to be inspected at least in 2012. In 2015, KHACHATRYAN's last full year in office, Araratcement PB was subject to a tax inspection, but tax authorities determined that the company owed unpaid taxes and penalties of only 10,020,716 Armenian dram (less than $25,000 USD). A retrospective inspection of Araratcement PB's tax liability conducted after KHACHATRYAN left office found that Araratcement PB actually owed 7,496,360,553 Armenian dram (more than $15,000,000 USD) in unpaid taxes and penalties in 2015, not the

7

significantly smaller sum that had been assessed while KHACHATRYAN was in office.

33. Several other of ARUSTAMYAN's companies were also found to have unpaid tax liabilities that should have been detected by tax inspections while KHACHATRYAN was in office. For example, after KHACHATRYAN left office, Multi Leon and Multi Gaz were found to have owed 4,455,474,931 and 4,308,584,225 Armenian dram respectively (more than $9,000,000 USD each).

34. On or about August 27, 2019, Armenian authorities charged KHACHATRYAN with abuse of power and embezzlement. On or about July 22, 2020, Armenian authorities charged KHACHATRYAN with receiving bribes from ARUSTAMYAN under the cover of the sham loan agreements signed by ARTYOM and GURGEN, which are described above as Loan-1 and Loan-2. The charges and evidence have now been submitted to an Armenian court for a ruling.

35. On or about April 28 and April 29, 2020, Armenian authorities charged GURGEN and ARTYOM with receiving bribes on behalf of their father and laundering the proceeds of the bribes through the use of sham loan agreements. GURGEN and ARTYOM have fled Armenia.

36. On or about April 30, 2020, Armenian prosecutors charged ARUSTAMYAN with paying bribes to KHACHATRYAN, GURGEN, and ARTYOM.

**II. The Purchase Of The Veto Estate**

37. KHACHATRYAN, GURGEN, and ARTYOM formed entities to receive, disguise, and conceal illegal bribe payments and to disguise and conceal their ownership of the Veto Estate. These entities include the Veto Trust; WRH, Inc.; and WRH, LLC.

38. On or around July 7, 2011, the Veto Trust entered into a $14,400,000 Residential Purchase Agreement for the Veto Estate. The

8

Veto Estate, as described above, is a residential property located in Los Angeles, California.  GURGEN signed the Residential Purchase Agreement on behalf of the Veto Trust.  He did so with the intention that the Veto Estate would become a residence for the Khachatryan family.

39.   As proof of their ability to make the purchase, GURGEN provided the seller's agent with a letter from an Armenian bank stating that GURGEN held over $15,000,000 in an account at that bank. The letter, however, was false and the referenced account did not hold those funds.

40.   Instead, the Veto Trust purchased the Veto Estate with illegal bribe payments from ARUSTAMYAN.

41.   First, on July 8, 2011, ARUSTAMYAN caused approximately $999,500 to be wired from an HSBC account in Armenia in his name to the Veto Trust's Bank of America account ending in '7103 in the United States.

| No. | Date | Amount in USD | Sender | Recipient | Recipient's Bank |
|---|---|---|---|---|---|
| 1. | 7/8/2011 | $999,500.00 | Arustamyan | Veto Trust | Bank of America |

42.   Four days later, on July 12, 2011, the Veto Trust used check No. 102 in the amount of $1,000,000 drawn on the same Bank of America Account to open escrow with West Coast Escrow at Comerica Bank for purchase of the Veto Estate.

43.   After the Veto Trust's initial $1 million payment, ARUSTAMYAN paid the substantial remainder of the purchase price directly to West Coast Escrow at its account at Comerica Bank.  From July 27, 2011 to August 3, 2011, ARUSTAMYAN caused the following wire

9

transfers to be made from HSBC Bank accounts in Armenia in his name to the West Coast Escrow account at Comerica Bank:

| No. | Date | Amount in USD | Sender | Recipient | Recipient's Bank |
|---|---|---|---|---|---|
| 2. | 7/27/2011 | $1,998,981.00 | Arustamyan | West Coast Escrow | Comerica Bank |
| 3. | 7/28/2011 | $1,998,980.50 | Arustamyan | West Coast Escrow | Comerica Bank |
| 4. | 7/29/2011 | $1,998,980.05 | Arustamyan | West Coast Escrow | Comerica Bank |
| 5. | 8/2/2011 | $2,398,780.60 | Arustamyan | West Coast Escrow | Comerica Bank |
| 6. | 8/3/2011 | $5,005,477.25 | Arustamyan | West Coast Escrow | Comerica Bank |

44. Wires 2 through 6 in the above table total $13,401,199.40. This sum corresponds to the amount of Loan-2, the $13,400,000 sham loan agreement that ARUSTAMYAN entered with GURGEN and ARTYOM on July 10, 2011. Each of Wires 1 through 6 was an illegal bribe payment.

45. Despite having funded the purchase of the Veto Estate, ARUSTAMYAN signed an Escrow Modification on July 29, 2011, that read in part "Arustamyan Sedrak understands that he will not appear on title to subject property and relinquishes any claim to funds deposited herein."

46. The purchase of the Veto Estate closed on or around August 5, 2011.

47. On or around October 26, 2011, the Landry Design Group ("LDG"), a residential architecture firm based in Los Angeles, provided ARTYOM and GURGEN a proposal to design a new house on the Veto Estate property. GURGEN and ARTYOM told LDG that they wanted their children to attend school in Los Angeles and instructed them to design the home as their family's residence.

10

48. GURGEN and ARTYOM retained LDG to design a home at the Veto Estate, which was to be constructed after the demolition of the existing house. LDG issued a complete set of construction drawings in or around December 2013, though it continued to revise the drawings even after construction began.

49. The drawings called for a residence with at least 10 bedrooms (in addition to separate servants' quarters), a two-story library, a wine cellar, a theater, a squash court, a "hammam," and an indoor swimming pool. The bedrooms in the residence were labelled as intended for GURGEN and his wife, ARTYOM and his wife, for the children of both couples, for Angela (GURGEN and ARTYOM's sister), and for guests.

50. One bedroom was labeled simply "Master Bedroom"; although it was not identified on the drawings as such, this bedroom was intended for KHACHATRYAN and his wife, Laura Yepremyan. When Yepremyan met with designers, she provided guidance primarily on the design of the "Master Bedroom."

51. Construction on the new residence began in 2015.

52. On or around May 13, 2016, the Veto Trust transferred title to the Veto Estate to WRH, LLC. The trust transfer deed cited California Revenue & Taxation Code § 11925(d), which concerns transfers "that result[] solely in a change in the method of holding title . . . and in which proportional ownership interests . . . remain the same." Cal. R&T Code 11925(d).

53. On or around May 15, 2019, WRH, LLC converted into WRH, Inc.

54. On or around April 7, 2022, the Veto Estate was listed as for sale on TheMLS multiple listing service, a database used by real estate brokers to advertise properties for sale.

## ALLEGATIONS OF FOREIGN LAW

55. The laws of the Republic of Armenia criminalize bribery of public officials and the receipt of bribe payments by public officials.

56. Article 311 of the Criminal Code of the Republic of Armenia makes it a criminal offense for a public official to receive a bribe personally or through an intermediary.

57. Article 312 of the Criminal Code of the Republic of Armenia makes it a criminal offense to give a bribe to a public official personally or through an intermediary.

58. Article 313 of the Criminal Code of the Republic of Armenia makes it a criminal offense to facilitate a bribe either by promoting an agreement between the bribe payer and the bribe taker or by implementing a previously reached agreement.

59. Each of the above offenses is punishable by imprisonment for a term exceeding one year.

## FIRST CLAIM FOR RELIEF
### (18 U.S.C. § 981(a)(1)(A))

60. The preceding paragraphs are incorporated by reference as if fully set forth herein.

61. The defendant in rem is property involved in, or traceable to property involved in, a transaction in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i), 1956(a)(1)(B)(i), 1956(a)(2)(A), 1956(a)(2)(B)(i), 1956(h), and 1957.

12

62. For purposes of 18 U.S.C. §§ 1956 and 1957, "specified unlawful activity" includes, among other things, "an offense against a foreign nation . . . involving bribery of a public official." 18 U.S.C. § 1956(c)(7)(B)(iv).

63. As set forth above:

    a. the defendant in rem is property involved in, or is traceable to property involved in, a financial transaction or attempted financial transaction involving the proceeds of an offense against a foreign nation involving bribery of a public official, which transaction or attempted transaction was conducted with the knowledge that the property involved in the transaction represented the proceeds of some form of unlawful activity and with the intent to promote the carrying on of specified unlawful activity in violation of 18 U.S.C. § 1956(a)(1)(A)(i);

    b. the defendant in rem is property involved in, or is traceable to property involved in, a financial transaction or attempted financial transaction involving the proceeds of an offense against a foreign nation involving bribery of a public official, which transaction or attempted transaction was conducted with the knowledge that the property involved in the transaction or attempted transaction represented the proceeds of some form of unlawful activity and that the transaction or attempted transaction was designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified

  unlawful activity in violation of 18 U.S.C.
§ 1956(a)(1)(B)(i);

  c. the defendant in rem is property involved in, or is traceable to property involved in, the transportation, transmission, or transfer, or the attempted transportation, transmission, or transfer, of a monetary instrument or funds to a place in the United States from or through a place outside the United States with the intent to promote the carrying on of an offense against a foreign nation involving bribery of a public official in violation of 18 U.S.C. § 1956(a)(2)(A);

  d. the defendant in rem is property involved in, or is traceable to property involved in, the transportation, transmission, or transfer, or the attempted transportation, transmission, or transfer, of a monetary instrument or funds to a place in the United States from or through a place outside the United States, with the knowledge that the monetary instruments or funds represented the proceeds of some form of unlawful activity and with the knowledge that the transportation, transmission, or transfer, or attempted transportation, transmission, or transfer, was designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of an offense against a foreign nation involving bribery of a public official in violation of 18 U.S.C. § 1956(a)(2)(B)(i);

  e. the defendant in rem is property involved in, or is traceable to property involved in, a monetary

    transaction or attempted monetary transaction, affecting interstate or foreign commerce, in criminally derived property of a value greater than $10,000 derived from an offense against a foreign nation involving bribery of a public official, which transaction or attempted transaction was conducted with the knowledge that the property involved was criminally derived in violation of 18 U.S.C. § 1957; and

    f.   the defendant <u>in</u> <u>rem</u> is property involved in, or traceable to property involved in, a conspiracy in violation of 18 U.S.C. § 1956(h).  Specifically, the defendant <u>in</u> <u>rem</u> is property involved in, or traceable to property involved in, a conspiracy to commit the violations of 18 U.S.C. §§ 1956(a)(1)(A)(i), 1956(B)(i), 1956(a)(2)(A), 1956(a)(2)(B)(i), and 1957 set forth in subparagraphs a through e above.

64.   For each of the above reasons, the defendant <u>in</u> <u>rem</u> is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

**SECOND CLAIM FOR RELIEF**
**(18 U.S.C. § 981(a)(1)(B))**

65.   The preceding paragraphs are incorporated by reference as if fully set forth herein.

66.   The defendant <u>in</u> <u>rem</u> is property that constitutes, is derived from, or is traceable to proceeds obtained directly or indirectly from an offense against a foreign nation involving bribery of a public official, or was used to facilitate such an offense, which offense is a specified unlawful activity under 18 U.S.C. § 1956(c)(7)(B)(iv) that would be punishable for a term of

15

imprisonment exceeding one year within the foreign jurisdiction and would be punishable under the laws of the United States by imprisonment for a term exceeding one year, if the act or activity constituting the offense had occurred within the jurisdiction of the United States.

67. The defendant in rem is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(B).

### THIRD CLAIM FOR RELIEF
### (18 U.S.C. § 981(a)(1)(C))

68. The preceding paragraphs are incorporated by reference as if fully set forth herein.

69. The defendant in rem is property that constitutes, or is derived from, proceeds traceable to an offense against a foreign nation involving bribery of a public official, which is a specified unlawful activity under 18 U.S.C. § 1956(c)(7)(B)(iv), or a conspiracy to commit such an offense.

70. The defendant in rem is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff the United States of America requests:

(i) that the defendant in rem be proceeded against according to the law and the rules of this Court, and that due notice be given to all the interested parties to appear and show cause why forfeiture should not be decreed;

(ii) that the Court, for the reasons set forth herein, adjudge and decree that the defendant in rem be forfeited to the United States of America and disposed of in accordance with existing laws, together

with costs; and

    (iii) that the Court order such other relief as it deems just, appropriate and in accordance with law.

                          Respectfully submitted,

DATED: May 2, 2022        DEBORAH CONNOR, Chief
                              D. HUNTER SMITH, Trial Attorney
                              Money Laundering and Asset Recovery Section
                              Criminal Division
                              United States Department of Justice

                              TRACY L. WILKISON
                              United States Attorney
                              SCOTT M. GARRINGER
                              Assistant United States Attorney
                              Chief, Criminal Division
                              JONATHAN GALATZAN
                              Assistant United States Attorney
                              Chief, Asset Forfeiture Section

                              */s/ Maxwell Coll*

                              MAXWELL COLL
                              Assistant United States Attorney

                              Attorneys for Plaintiff
                              UNITED STATES OF AMERICA

## VERIFICATION

I, Mark Newhouse, hereby verify and declare under penalty of perjury that I am a Special Agent with the Federal Bureau of Investigation, that I have read the foregoing Verified Complaint for Forfeiture In Rem and know the contents thereof, and that the factual allegations contained in the Verified Complaint are true to the best of my knowledge and belief.

_____
SA Mark Newhouse

Executed this __2__ day of __May__, 2022 in Los Angeles, California.