1  CHRISTOPHER W. JAMES (SBN 289047)
   cjames@velaw.com
2  Vinson & Elkins LLP
   350 South Grand, Suite 2100
3  Los Angeles, CA  90071
   555 Mission Street, Suite 2000
4  San Francisco, California  94105
   Telephone:  415.979.6949
5  Facsimile:   415.651.8786

6  EPHRAIM WERNICK (admitted *pro hac vice*)
   ewernick@velaw.com
7  PETER T. THOMAS (admitted *pro hac vice*)
   petethomas@velaw.com
8  Vinson & Elkins LLP
   2200 Pennsylvania Ave. NW, Suite 500 West
9  Washington, DC  20037
   Telephone:  202.639.6500
10 Facsimile:   202.639.6604

11 *Attorneys for Claimants*
   *Artyom Khachatryan, Gurgen Khachatryan, and WRH, Inc.*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff.<br><br>v.<br><br>REAL PROPERTY IN LOS ANGELES, CALIFORNIA,<br><br>Defendant,<br><br>and<br><br>ARTYOM KHACHATRYAN, GURGEN KHACHATRYAN, and WRH, INC.,<br><br>Claimants,<br><br>and<br><br>SEDRAK ARUSTAMYAN,<br><br>Claimant. | Case No. 2:22-cv-02902<br><br>**ANSWER AND AFFIRMATIVE DEFENSES OF CLAIMANTS ARTYOM KHACHATRYAN, GURGEN KHACHATRYAN, AND WRH, INC. TO PLAINTIFF UNITED STATES' COMPLAINT FOR FORFEITURE *IN REM***<br><br>**DEMAND FOR JURY TRIAL** |

Pursuant to Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, Claimants Artyom Khachatryan ("Artyom"), Gurgen Khachatryan ("Gurgen"), and WRH, Inc. ("WRH") (collectively, "Claimants") set forth the following Answer and Affirmative Defenses to the Plaintiff United States' ("Plaintiff" or the "Government") Complaint for Forfeiture *In Rem* (the "Complaint").[1]

## INTRODUCTION

By hurriedly filing this barebones Complaint, the United States Government has unfortunately and unwittingly allowed itself to be inserted into the middle of an internal Armenian conflict, whereby the current Armenian Prime Minister has fed the Government incomplete and inaccurate disinformation to further his illegitimate persecution of political rivals and their families. The Armenian administration has targeted Claimants Gurgen and Artyom Khachatryan, two successful and apolitical businessmen, for no other reason than that they are sons of a former Armenian official, Gagik Khachatryan ("Gagik"), a financial technocrat who served in the former Armenian government. The Armenian corruption case against the Khachatryans (echoed through the pages of the Government's Complaint) is built on nothing but unfounded speculation, propaganda, and baseless attacks. Moreover, the only factual underpinning of the Government's strained bribery theory has already been reviewed *and overturned* by Armenian administrative courts. Apparently relying on Armenian disinformation, the Government hastily filed its Complaint and now seeks to forfeit a high-value investment property (the "Property") that Claimants lawfully obtained and painstakingly developed over the last decade at great personal

---

[1] Claimants are aware that another party, Sedrak Arustamyan, has filed a claim to the property at issue, as well as counterclaims against the Government and cross-claims against Claimants. Dkt. 19, 20. Claimant's present Answer does not address the cross-claims filed by Arustamyan, the merits of which Claimants intend to challenge in a separate filing. By filing this Answer to the Government's Complaint, Claimants do not waive any arguments or defenses concerning jurisdiction or forum as to the improper and inappropriate claims filed by Arustamyan.

time and expense to Artyom, Gurgen, and their multiple investors.

Brothers Gurgen and Artyom, along with their cousin, are successful Armenian businessmen who co-founded and now run a multinational conglomerate, called the Galaxy Group of Companies. Since 1999, the brothers have shepherded the successful growth of start-up companies in Armenia and neighboring countries across numerous industries, most significantly in telecommunications, retail, and food imports. Their business partners include successful multinational companies like Swatch Group, Richmond Group, Marriott International and PAUL international, among others. Galaxy Group is a fixture in the Armenian business community and is one of the country's largest taxpayers and employers.

In the wake of the sub-prime mortgage crisis of 2008, Gurgen and Artyom recognized a business opportunity to purchase and develop undervalued properties in the United States. Their venture has involved the purchase, development, and resale of multiple high-value assets in California, consisting of both single and multi-family residential properties. Gurgen and Artyom financed the projects with personal funds generated by their business operations, loans from European banks, and loans from connections within Armenia's relatively small and close-knit business community.

The contested Property was only one of several of Claimants' real estate investments at the time, and it was transparently purchased by Gurgen and Artyom in 2011 with the intent of developing it into a more valuable residential property. Claimants have since invested tens of millions of dollars demolishing the original structure, improving the grounds, and constructing the impressive "mansion" described at length in the pages of the Complaint. Several years ago, with changed market conditions providing the opportunity for Claimants to realize a substantial profit, they decided to put the Property on the market, halting construction at a point where the grounds and exterior were largely complete but the interior design could be completed by a new owner. After unsuccessfully marketing the property to private investors, the Property was publicly listed for sale, triggering the Government's

rushed forfeiture action.[2]

The Government's forfeiture action is premised on dubious theories promoted by the regime of the current Armenian Prime Minister, Nikol Pashinyan ("Pashinyan"), who rose to power in the aftermath of violent riots that he incited. After assuming power, Pashinyan immediately used the tools of power to target political rivals for prosecution, including Gagik Khachatryan (a financial technocrat who was elevated to serve as a minister by the previous administration) and Sedrak Arustamyan (a successful businessman affiliated with another rival Armenian political party). Specifically, the Armenian government has furnished disinformation to Plaintiff that apparently induced the Government to file the instant Complaint alleging that a series of legitimate loan agreements Gurgen and Artyom entered into over 10 years ago with Arustamyan actually were bribes intended for Gagik.[3]

In reality, when Gurgen and Artyom first considered investing in real estate in the United States, they approached numerous potential investors, including Arustamyan, with the goal of securing loans to help the brothers fund their

---

[2] The Government's Complaint was filed just three weeks after the Property was publicly listed. The Complaint's timing and barebones nature are curious given that Claimants' sale of the Property should have come as no surprise to the Government. Claimants contacted the Government multiple times through U.S. counsel in 2019, and most recently in late 2021, after learning from business associates that the Federal Bureau of Investigation ("FBI") was asking questions about Claimants' investment and development of the Property. Through counsel, Claimants specifically contacted leadership at both the FBI and U.S. Department of Justice's Money Laundering and Asset Recovery Sections and offered to speak directly with law enforcement so the Government would have the benefit of complete information before making any decisions based solely on the one-sided and politically motivated disinformation provided by a hostile Armenian regime. In late 2021, Claimants were advised by an FBI supervisor that there was no reason to speak with them. In response, Claimants transparently explained their intent to move forward with the sale of the Property. Claimants received no objection from the Government at the time and only learned of the Government's opposition after reading about the filing of the forfeiture complaint in the press.

[3] For the Court's contextual understanding, the history of Pashinyan's rise to power on the heels of riots known in Armenia as the "velvet revolution," and his relentless harassment of the Khachatryan family are described in more detail in Claimants' Motion for Judgment on the Pleadings, being filed concurrently with this Answer.

investments. In 2009, Arustamyan agreed to provide Gurgen and Artyom with a one-year loan that the brothers initially used to partially fund the purchase of a property in Beverly Hills ("Loan-1"). The brothers quickly flipped that property and resold it one year later at a substantial profit. Having proven the viability of their real estate investment strategy, the brothers convinced Arustamyan to extend the repayment of the loan so that the proceeds from the brothers' investment could be reinvested in a second high-value property, which the brothers acquired the following month. In 2011, Gurgen and Artyom identified a third investment target—the Property contested in this forfeiture action—but their funds were tied up in other investments at the time. They thus secured an additional loan from Arustamyan ("Loan-2"), under similar terms to Loan-1 and Claimants used funds from Loan-2 to help finance the purchase of the Property. These loans with Arustamyan were properly and transparently documented, established a fixed term for repayment of 4% interest, and provided for penalties in the event of late payment.

While the Government baselessly asserts that there was no expectation of repayment, Claimants have since repaid both loans, with interest, to Arustamyan per the terms of the loan agreements. Gurgen and Artyom are presently embroiled in civil litigation with Arustamyan in Armenia over these very loan agreements, which one would not expect to see if the loans were actually corrupt bribe payments.

The Government's Complaint tellingly omits this highly significant and exculpatory context, especially the facts concerning Claimants' long-standing history of buying and selling real estate in Los Angeles County and the clear evidence that the loan agreements at issue carried an expectation of repayment. These omissions strongly suggest that the Armenian government has been playing fast and loose with the information it chose to provide to the Government, causing the Plaintiff to file this unfortunate claim. Indeed, the portions of the Complaint that are supposed to address the supposed underlying corruption—the foundation of the entire forfeiture action—simply mirror flimsy and conclusory accusations that have been made in

Armenian proceedings. The Armenian government assumes that because Gurgen and Artyom are successful, their wealth must be the result of corruption rather than (their objectively clear) business acumen. The theory that the loan agreements with Arustamyan were actually bribe payments intended to benefit Gurgen and Artyom's father Gagik has no factual basis. Even with the cooperation of the Armenian regime and easy access to available information in Armenia, the Government's present Complaint points to no facts that actually support the corruption theory. There are no factual allegations detailing any relationship at all between Arustamyan and Gagik, much less a corrupt one: no communications or agreements between the two men, no request or offer of a bribe payment, no official act sought or performed by Gagik to the benefit of Arustamyan, nor any legal interest Gagik had in the Property. None of these facts are alleged because none exist. The barebones Complaint merely concludes that, because Gagik was in a position of power, any business relationship Arustamyan entered with Gurgen and Artyom must have been corrupt and to secure Gagik's influence.

Unable to allege any facts of an actual underlying corrupt relationship, the Complaint instead relies entirely on a circumstantial set of purported tax benefits Arustamyan received before Gagik retired from service in Armenia's tax authority, theorizing that Arustamyan's loan agreements with Artyom and Gurgen must have been made to secure favorable tax treatment. To support this allegation, the Government's Complaint points to specific tax inspections conducted by Pashinyan's tax authorities that determined that certain companies affiliated with Arustamyan significantly underpaid their taxes in 2015, the last year Gagik was in office.[4] However, the truth is that Armenian courts have reviewed *and overturned* each of

---

[4] The allegedly favorable tax treatment for Arustamyan was *six years after* Claimants and he first formed their business relationship in 2009. The timing alone hardly supports a corrupt arrangement. Moreover, the tax assessments cited in the Complaint purported to find tax liabilities for 2016, 2017, and 2018 covering periods after Gagik left office and was no longer in a position to help Arustamyan even if he had wanted to. It is thus hard to find any support for the Government's circumstantial claims based on the basic timing of the allegations themselves.

the tax audits cited in the Complaint. Specifically, the precise tax assessments so heavily relied upon in the Complaint—those against Araratcement, Multi Gaz, and Multi Leon—were each overturned by Armenia's administrative courts over a year and a half ago. In each instance, the Armenian courts found that the Pashinyan administration's alternative tax liability calculations were without any factual basis, and that his inspectors performed improper analyses that drew irrational conclusions and ignored critical counter evidence. These significant and highly exculpatory facts directly contradict the Government's claims, begging the question of why the audits were even included in the Complaint, much less as the corruption theory's sole supporting allegation. Once again, it appears that the Government has been getting incomplete information from the Armenian side, and has unfortunately premised its forfeiture action on these half-truths and disinformation.

It is upon this shockingly thin Complaint, replete with little more than conclusory allegations of corruption, that the Government relies to justify the draconian forfeiture of Claimants' Property valued at over $53 million. Claimants generally deny that the Property is properly subject to forfeiture, or that there has been any violation of foreign law or money laundering statutes to support such a claim. Though the Complaint is rife with conclusory allegations describing the loans as "illegal bribe payments" or being based on "sham loan agreements," and therefore that the funds were "disguised" or "concealed," these are merely legal conclusions and characterizations without any factual basis. Claimants deny all such allegations and bring the affirmative defenses described herein. To the extent an allegation requiring a response is not specifically addressed below, it is denied.

The Government's forfeiture action has caused immense harm both to Claimants' businesses and reputation. Claimants demand a jury trial and respectfully request a speedy resolution of this matter to remove the Government's unjust impairment of their Property and repair the incredible harm that this unfortunate action has done to them.

## ANSWER

**1.** Admitted.

**2.** Claimants admit that Gagik was the former minister of finance of the Republic of Armenia, and that Gurgen and Artyom are Gagik's sons. Claimants deny that the Property is traceable to "unlawful bribes" or any illegal money laundering transaction. Claimants deny the remainder of Paragraph 2, which consists of unsupported legal conclusions.

## PARTIES, PERSONS, AND ENTITIES

**3.** Admitted.

**4.** Claimants admit that Plaintiff asserts the defendant *in rem* is the Property described in Exhibit A to the Complaint. Claimants deny the remainder of Paragraph 4, which suggests a legal conclusion regarding the appropriate scope of the forfeiture action.

**5.** Claimants admit that between 2008 and 2016, Gagik served first as chairman of the State Revenue Committee and later as the minister of finance of the Republic of Armenia. On information and belief, Gagik has been charged in a politically motivated and unjust prosecution in Armenia with violating Article 311 of the Armenian Criminal Code.

**6.** Claimants admit that Gurgen and Artyom are the adult sons of Gagik. Gurgen and Artyom have been charged in politically motivated and unjust prosecutions in Armenia. Claimants deny that they have been charged with a violation of Article 311 of the Armenian Criminal Code, but admit that they have been charged with a violation of Article 38-311 of the Armenian Criminal Code.

**7.** Claimants admit that Sedrak Arustamyan is a prominent businessman in Armenia and that he is the director of Multi Group Concern. Claimants are generally aware, but lack knowledge as to, the specific nature or status of the politically motivated and unjust criminal charges against Arustamyan in Armenia, and therefore neither admit nor deny the remainder of the allegations in Paragraph 7.

**8.** Claimants admit that Tadevos T. Khachatrian ("Ted") is a relative of Gagik, Gurgen and Artyom, and that Ted resides in Los Angeles, California. Claimants further admit that Ted served as a U.S.-based representative of Gurgen and Artyom who managed some of the brothers' various real estate investments in California, including the Property. Claimants deny that Ted was ever a representative of Gagik.

**9.** Claimants admit the allegations of Paragraph 9, except for the unsupported mischaracterization of the funds used to purchase the Property. Claimants deny that these funds were "unlawful bribes."

**10.** Admitted.

**11.** Admitted.

**12.** Admitted.

## JURISDICTION AND VENUE

**13.** Admitted.

**14.** Admitted.

**15.** Claimants deny that acts or omissions giving rise to forfeiture occurred in this or any district. Claimants admit that the defendant *in rem* is located in this district.

## BASIS FOR FORFEITURE

**16.** Claimants admit that beginning in or around 1996 through at least on or around December 31, 2009, Gagik held various positions in tax and customs agencies of the Republic of Armenia. Claimants deny the remainder of Paragraph 16.

**17.** Claimants admit that Gagik was appointed chairman of the State Revenue Committee of the Republic of Armenia on or about August 20, 2008, and that he remained in that position until being appointed as Minister of Finance of the Republic of Armenia. Claimants lack specific knowledge as to the division of responsibilities among government agencies under Armenian law, and therefore neither admit nor deny the remainder of allegations in Paragraph 17.

**18.** Claimants admit that Gagik Khachatryan was appointed Minister of Finance of the Republic of Armenia on or around April 26, 2014, at which point he was relieved of his post as the chairman of the State Revenue Committee. Claimants admit that the term "Super Minister" is a pejorative and politically charged term that has been used by the media and Gagik's political opponents. Claimants lack knowledge as to the division of responsibilities among government agencies under Armenian law or the responsibilities exercised specifically by Gagik. Claimants deny the remainder of allegations in Paragraph 18.

**19.** Admitted.

**20.** On information and belief, Claimants admit that Arustamyan was affiliated with certain entities associated with the Multi Group, but Claimants lack knowledge as to which specific companies or the nature or title associated with Arustamyan's affiliation with such companies. Claimants further lack specific knowledge concerning the legal conclusions in Paragraph 20 concerning Armenian tax law, and therefore neither admit nor deny those allegations in Paragraph 20.

**21.** Denied.

**22.** Claimants admit that Gurgen and Artyom entered into loan agreements with Arustamyan, but deny that the agreements were "sham" or that payments were "disguised" in any way. Claimants deny the remainder of Paragraph 22, which consists of unsupported legal mischaracterizations and allegations that are largely contradicted by even the allegations in the Complaint's following paragraph.

**23.** Claimants admit that Gurgen and Artyom entered a loan agreement with Arustamyan on or around July 9, 2009 (Loan-1), the terms of which are memorialized in Exhibit A, including that (as alleged) the principal amount was $7,000,000, and was originally due to be paid in full plus 4 percent interest on July 30, 2010, with penalties for failure to repay. Claimants deny the Complaint's unsupported mischaracterization of Loan-1 as a "sham loan agreement" and the remainder of the allegations in Paragraph 23.

**24.** Admitted.

**25.** Claimants admit that Loan-1 was amended on or around July 29, 2010 to extend the repayment date to July 30, 2015 and again on or around July 28, 2015 to extend the repayment date to July 30, 2019. Claimants admit that Arustamyan did not charge any penalties on the loan; none was due because repayment was never late.

The allegation that Arustamyan received no consideration for extensions of the loan is a legal conclusion to which no response is required. To the extent a response is required, the allegation is denied. All other allegations in Paragraph 25 are denied.

**26.** Claimants admit that Gurgen and Artyom entered a loan agreement with Arustamyan on or around July 10, 2011 (Loan-2), the terms of which are memorialized in Exhibit D, including that (as alleged) the principal amount was $13,400,000, and was originally due to be paid in full plus 4 percent interest on July 10, 2016, with penalties for failure to repay. Claimants further admit that certain funds from Loan-2 were used to purchase the Property. Claimants admit that the Loan-2 agreement did not provide Arustamyan with a security interest in the Property *See* Exhibit D, Sec. 2.

The Complaint's unsupported mischaracterization of Loan-2 as a "sham loan agreement" is a legal conclusion to which no response is required. To the extent a response is required, this characterization is denied. All other allegations in Paragraph 26 are denied.

**27.** Claimants admit that Loan-2 was extended by agreement on or around July 7, 2016, to July 10, 2019. Claimants admit that Arustamyan did not charge any penalties on the loan; none was due because repayment was never late.

The allegation that Arustamyan received no consideration for extensions of the loan is a legal conclusion to which no response is required. To the extent a response is required, the allegation is denied. All other allegations in Paragraph 27 are denied.

**28.** Denied.

**29.**  Denied.

**30.**  Claimants admit that Pashinyan used and directed Armenian tax authorities to target political rivals by conducting retrospective tax inspections of certain companies, but Claimants lack knowledge as to the timing, scope, or companies subjected to such inspections, and therefore neither admit nor deny those allegations. Claimants lack knowledge regarding the application of Armenia's statutes of limitations to retrospective inspections, and therefore neither admit nor deny that allegation. All other allegations in Paragraph 30 are denied.

**31.**  Claimants lack knowledge as to the purported findings of the so-called "retrospective tax inspections," or the existence of any actual tax liability associated with companies affiliated with Arustamyan, and therefore neither admit nor deny the allegations in Paragraph 31. However, on information and belief, Claimants understand that certain of these companies have and continue to successfully challenge tax assessments imposed against them, resulting in multiple assessments being overturned by Armenian courts.

**32.**  Claimants lack knowledge as to the purported findings of the so-called "retrospective inspection" of Araratcement, and therefore neither admit nor deny the allegations in Paragraph 32. Certain assessments against Araratcement resulting from that inspection have been overturned by the Administrative Court of the Republic of Armenia; to the extent the allegations of Paragraph 32 allege the accuracy or legitimacy of the inspection's findings, those allegations are denied. All other allegations in Paragraph 32 are denied.

**33.**  Claimants lack knowledge as to the existence, nature or details of the alleged inspections of the unnamed entities described in Paragraph 33, or the purported findings of inspections against Multi Leon and Multi Gaz, and therefore neither admit nor deny the allegations in Paragraph 33. Certain assessments against Multi Leon and Multi Gaz resulting from the alleged inspections have been overturned by the Administrative Court of the Republic of Armenia; to the extent

Paragraph 33 alleges the accuracy or legitimacy of the inspections' findings, those allegations are denied. All other allegations in Paragraph 33 are denied.

**34.** Claimants admit that Pashinyan has used and directed Armenian authorities to target Gagik for politically motivated and unjust prosecutions and charged him with abuse of power and embezzlement on or about August 27, 2019, and with receiving bribes from Arustamyan on or about July 22, 2020, on the basis of the loan agreements Arustamyan entered with Claimants. Claimants further admit that as of the time of this Answer, the charges and evidence have been submitted to an Armenian court, but have not yet been ruled upon. To the extent Paragraph 34 alleges the accuracy or legitimacy of the charges filed against Gagik, those allegations are denied. All other allegations in Paragraph 34 are denied.

**35.** Claimants admit that Pashinyan has used and directed Armenian authorities to target Gurgen and Artyom for politically motivated and unjust prosecutions and charged them with receiving bribes on or about April 28 and 29, 2020. To the extent Paragraph 35 alleges the accuracy or legitimacy of the charges filed against Gurgen and Artyom, those allegations are denied. Claimants admit that they left Armenia as political refugees and were granted political asylum to protect them from unlawful persecution by Pashinyan's regime. All other allegations in Paragraph 35 are denied.

**36.** Claimants admit that Pashinyan has used and directed Armenian authorities to target Arustamyan for politically motivated and unjust prosecutions and charged him with paying bribes to Gagik, Gurgen, and Artyom on or about April 30, 2020. To the extent Paragraph 36 alleges the accuracy or legitimacy of the charges filed against Arustamyan, those allegations are denied.

**37.** Claimants admit that they formed the Veto Trust, WRH, LLC, and WRH, Inc. Claimants deny the remainder of the allegations in Paragraph 37.

**38.** Claimants admit the timing and amount of their purchase of the Property, and that Gurgen transparently signed the Residential Purchase Agreement

in his capacity as trustee of the Veto Trust. Claimants admit that the primary use for the Property was to be developed and sold, and they considered the possibility that the Property could serve as a possible residence for Gurgen and Artyom and their families until the Property could be sold for a profit. Claimants deny all other allegations in Paragraph 38.

**39.** Denied.

**40.** Claimants admit that Gurgen and Artyom purchased the Property as an asset of the Veto Trust, using funds from the Loan-2 loan agreement entered with Arustamyan. Claimants deny the legal conclusion or characterization of those funds as "illegal bribe payments."

**41.** Admitted.

**42.** Admitted.

**43.** Admitted.

**44.** Claimants admit the sum of wire transactions identified in Paragraph 43 is $13,401,199.40. Claimants further admit that the principal amount of Loan-2 was $13,400,000. Claimants deny the remainder of Paragraph 44, including that the loan was a "sham" agreement.

**45.** Claimants admit that Claimants used certain funds from Arustamyan's loans to purchase the Property. Claimants further admit that Arustamyan signed an Escrow Modification on July 29, 2011 that precluded any claim by Arustamyan to a secured interest or ownership interest in the Property because Arustamyan was only entitled to repayment of the loans pursuant to the specific terms of the loan agreements. As such, Claimants admit that the Escrow Modification described in Paragraph 45 included the specific representation that "Arustamyan Sedrak understands that he will not appear on title to subject property and relinquishes any claim to funds deposited herein."

**46.** Admitted.

**47.** Claimants admit that on or around October 26, 2011, the Landry Design

Group ("LDG"), a residential architectural firm based in Los Angeles, provided Gurgen and Artyom a proposal to design a new house on the Property on or around October 2011. Claimants deny that Artyom and Gurgen ever decided to relocate their families to Los Angeles, but admit that they may have engaged in casual communications with LDG concerning the possibility of relocating to Los Angeles and their children attending school there. The primary use for the Property was to be developed and sold for a profit, but Claimants admit that they considered the possibility that the Property could serve as a possible residence for Gurgen and Artyom and their families until the Property could be sold for a profit and they may have instructed LDG to design the Property with that potential use in mind.

**48.** Admitted.

**49.** Claimants admit that certain design drawings by LDG included multiple bedrooms, servants' quarters, a two-story library, a wine cellar, a theater, a squash court, a hammam, and an indoor swimming pool. Claimants further admit that certain LDG plans also included labels for rooms as indicated in Paragraph 49.

**50.** Claimants admit that certain drawings for the house being developed on the Property included a room labeled "Master Bedroom" by LDG, with no indications for any intended user. Claimants lack information concerning the remaining allegations in Paragraph 50 to admit or deny them.

**51.** Admitted.

**52.** Admitted.

**53.** Admitted.

**54.** Admitted.

## **ALLEGATIONS OF FOREIGN LAW**

**55.** Paragraph 55 is a statement or characterization of law to which no response is required.

**56.** Paragraph 56 is a statement or characterization of law to which no response is required.

**57.** Paragraph 57 is a statement or characterization of law to which no response is required.

**58.** Paragraph 58 is a statement or characterization of law to which no response is required.

**59.** Paragraph 59 is a statement or characterization of law to which no response is required.

## FIRST CLAIM FOR RELIEF

**60.** Claimants incorporate their responses to the preceding paragraphs by reference as if fully set forth herein.

**61.** Denied.

**62.** Paragraph 62 is a statement of law to which no response is required.

**63.** Denied.

**64.** Denied.

## SECOND CLAIM FOR RELIEF

**65.** Claimants incorporate their responses to the preceding paragraphs by reference as if fully set forth herein.

**66.** Denied.

**67.** Denied.

## THIRD CLAIM FOR RELIEF

**68.** Claimants incorporate their responses to the preceding paragraphs by reference as if fully set forth herein.

**69.** Denied.

**70.** Denied.

## AFFIRMATIVE DEFENSES

Claimants' Introduction to this Answer and responses to the enumerated paragraphs of the Complaint are incorporated by reference into their affirmative defenses as if fully set forth herein.

## FIRST AFFIRMATIVE DEFENSE

**(Failure to Comply with Supp. Rule G)**

Plaintiff's Complaint does not comply with the requirement of F.R.C.P. Supplemental Rule G(2)(f) to "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial."

**SECOND AFFIRMATIVE DEFENSE**

**(Failure to State a Claim)**

Plaintiff's Complaint fails to state claims upon which relief may be granted.

**THIRD AFFIRMATIVE DEFENSE**

**(Innocent Owner)**

Claimants considered Loan-1 and Loan-2 to at all times be the result of legitimate business transactions. They neither intended nor were aware of any intent that the loan agreements they entered with Arustamyan were for an alternative unlawful purpose. Claimants deny that any corrupt arrangement existed between Arustamyan and their father Gagik, but even if such arrangement existed, Claimants were unaware. They are therefore "innocent owners" of the Property, pursuant to 18 U.S.C. § 983(d).

**FOURTH AFFIRMATIVE DEFENSE**

**(Statute of Limitations)**

The claims are time-barred by the applicable statute of limitations.

**FIFTH AFFIRMATIVE DEFENSE**

**(Proportionality)**

Forfeiture of the Property, complete with all appurtenances, improvements, and attachments thereon, as well as leases, rents, and profits derived therefrom, is barred by the prohibition against excessive fines set forth in the Eighth Amendment to the United States Constitution. Even if the funds provided under the Loan-1 and Loan-2 agreements were improperly sourced (which they were not), those funds covered only a fraction of the Property's value—potentially funding only the purchase of the land on which the Property sits. The remainder of the Property's

development, including the demolition of pre-existing structures and construction of the so-called "multimillion-dollar mansion" was funded in large part by sources completely unrelated to Arustamyan, such as several millions of dollars in additional loans from a foreign bank. The Property is worth more than $53,000,000 today, and seizure of that amount would be grossly disproportional to the alleged offense. *See* 18 U.S.C. § 983(g).

## SIXTH AFFIRMATIVE DEFENSE
### (Unclean Hands)

Plaintiff is barred from the relief and judgment sought in the Complaint by the doctrine of unclean hands.

## SEVENTH AFFIRMATIVE DEFENSE
### (Laches)

Plaintiff is barred from the relief and judgment sought in the Complaint by the doctrine of laches.

## RESERVATION OF RIGHTS

Claimants reserve the right to assert additional affirmative defenses or amend these affirmative defenses as discovery warrants and to the extent that facts discovered in the course of this action support such affirmative defenses.

## JURY TRIAL DEMANDED

Claimants demand a trial by jury on all issues so triable.

**WHEREFORE**, Claimants hereby respectfully request that the Court:

    i.    deny Plaintiff's claim for forfeiture of the Property;

    ii.    order the removal of any encumbrances affiliated with the Property and/or return of any proceeds from interlocutory sale held on account with Plaintiff;

    iii.    order that Plaintiff pay Claimants' attorneys' fees and costs pursuant to 28 U.S.C. § 2465(b)(1)(A);

    **iv.**    order that Plaintiff pay pre- and post-judgment interest to Claimants pursuant to 28 U.S.C. §2465(b)(1)(B)–(C);

    **v.**    and enter such additional relief as the Court deems just and proper.

Dated:    July 7, 2022    VINSON & ELKINS LLP

By: /s/ *Ephraim Wernick*
    Ephraim Wernick
    Christopher W. James
    Peter T. Thomas

*Attorneys for Claimants Artyom Khachatryan, Gurgen Khachatryan, and WRH, Inc.*