1  CHRISTOPHER W. JAMES (SBN 289047)
   cjames@velaw.com
2  Vinson & Elkins LLP
   350 South Grand, Suite 2100
3  Los Angeles, CA 90071
   555 Mission Street, Suite 2000
4  San Francisco, California 94105
   Telephone: 415.979.6949
5  Facsimile: 415.651.8786

6  EPHRAIM WERNICK (admitted *pro hac vice*)
   ewernick@velaw.com
7  PETER T. THOMAS (admitted *pro hac vice*)
   petethomas@velaw.com
8  Vinson & Elkins LLP
   2200 Pennsylvania Ave. NW, Suite 500 West
9  Washington, DC 20037
   Telephone: 202.639.6500
10 Facsimile: 202.639.6604

11 *Attorneys for Claimants*
   *Artyom Khachatryan, Gurgen Khachatryan, and WRH, Inc.*
12
13              **UNITED STATES DISTRICT COURT**

14              **CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 15  UNITED STATES OF AMERICA, | Case No.: 2:22-cv-02902-JLS-PD |
| 16        Plaintiff. | **VERIFIED CLAIMANTS ARTYOM KHACHATRYAN, GURGEN KHACHATRYAN, AND WRH, INC.'S BRIEF IN OPPOSITION TO PLAINTIFF UNITED STATES OF AMERICA'S MOTION TO STAY** |
| 17        v. | |
| 18  REAL PROPERTY IN LOS ANGELES, CALIFORNIA, | |
| 19 | |
| 20        Defendant, | |
| 21        and | Date:       October 28, 2022 |
| 22  ARTYOM KHACHATRYAN, GURGEN KHACHATRYAN, and WRH, INC., | Time:       10:30 a.m. |
| 23 | Location:   Courtroom 8A |
| 24        Claimants, | Judge:      Hon. Josephine L. Staton |
| 25        and | Trial Date: None Set |
| 26  SEDRAK ARUSTAMYAN, | Date Action Filed: May 2, 2022 |
| 27        Claimant. | |
| 28 | |

# TABLE OF CONTENTS

I.    INTRODUCTION ..................................................................................................1

II.   BACKGROUND OF THE INVESTIGATION ....................................................3

III.  LEGAL STANDARD ...........................................................................................6

IV.   THE GOVERNMENT'S WORDS AND ACTIONS RAISE
      SIGNIFICANT DOUBTS ABOUT THE EXISTENCE OF AN
      ONGOING INVESTIGATION.............................................................................9

V.    THE GOVERNMENT CANNOT SHOW AN ADVERSE IMPACT ............10

      A.    Civil discovery will not cause "illicit" funds to change channels
            or result in spoliation..............................................................................10

      B.    The general principle of early or extra access to evidence does
            not warrant a stay here. ...........................................................................12

      C.    The Government's case is simple and already known to
            Claimants, eliminating the likelihood of any adverse impact................13

      D.    This Court should reject the Government's novel claim that
            ongoing Armenian proceedings should provide a shield against
            discovery. .................................................................................................16

VI.   THE STATUTE OF LIMITATIONS BARS ANY CRIMINAL
      ACTION, SO THERE IS NO POTENTIAL CRIMINAL CASE FOR
      THE GOVERNMENT TO BRING ....................................................................17

VII.  THE GOVERNMENT'S ACTIONS MERIT CLOSE SCRUTINY ...............21

VIII. CONCLUSION ...................................................................................................22

Case No.: 22-cv-02902-JLS-PD;
OPPOSITION TO MOTION TO STAY

# TABLE OF AUTHORITIES

**Cases**

*Apple Inc. v. Eastman Kodak Co.*, No. CV 10-04145 JW PSG,
2011 WL 334669 (N.D. Cal. Feb. 1, 2011) ....................................................6

*Arriaga v. City of New York*, No. 06 CIV. 2362PKCHBP,
2007 WL 582813 (S.D.N.Y. Feb.23, 2007) ...................................................6

*Grunewald v. United States*,
353 U.S. 391 (1957)......................................................................................19

*In re Any & All Funds Held in Republic Bank of Arizona Accts.
XXXXXXXX, XXXXXXXX, XXXXXXXX, & XXXXXXXX*,
774 F. App'x 400 (9th Cir. 2019) .................................................................7

*United States v. $1,026,781.61 in Funds From Fla. Cap. Bank*,
No. CV 09-04381-JVS ANX,
2013 WL 4714188 (C.D. Cal. July 29, 2013) ..........................................7, 10

*United States v. $177,844.68 in U.S. Currency*,
No. 2:13-CV-00100-JCM, 2015 WL 355495 (D. Nev. Jan. 27, 2015).......8, 16

*United States v. $3,592.00 U.S. Currency*,
No. 15-cv-6511, 2016 WL 5402703 (W.D. N.Y. Sept. 28, 2016) ..........................7

United States v. $341,500.00 in U.S. Currency,
No. 221CV06967RGKMAR,
2022 WL 2285659 (C.D. Cal. Mar. 8, 2022) ...............................................22

*United States v. $600,980.00 in U.S. Currency*,
No. 2:21-cv-06965-RGK-MAR,
2022 WL 2284934 (C.D. Cal. Mar. 8, 2022) .................................................7

*United States v. $68,145.34 in Bellco Credit Union Bank Account
#XXXXXXXX*, No. 18-cv-03208,
2020 WL 353115 (D. Colo. Jan. 17, 2020) ...................................................8

*United States v. All Funds ($357,311.68) Contained in N. Trust Bank of
Fla. Account No. 7240001868*, No. Civ. A. 3:04–1476,
2004 WL 1834589 (N.D. Tex. Aug. 10, 2004)..........................................7, 13

*United States v. Currency $716,502.44*, No. 08–CV–11475,
2008 WL 5158291 (E.D. Mich. Dec. 5, 2008)...........................................8, 13

*United States v. Jenkins*,
633 F.3d 788 (9th Cir. 2011) ........................................................................20

*United States v. Kozeny*,
638 F. Supp. 2d 348 (S.D.N.Y. 2009) ..........................................................18

*United States v. Real Property and Premises*,
657 F. Supp. 2d 1060 (D. Minn. 2009) .................................................7, 8, 13

*United States v. Sum of $70,990,605*,
4 F. Supp. 3d 209 (D.D.C. 2014)....................................................................8

*United States v. Walker*,
653 F.2d 1343 (9th Cir. 1981) ......................................................................19

*Willemijn Houdstermaatschaapij BV v. Apollo Computer Inc.*,
707 F.Supp. 1429 (D.Del.1989) .....................................................................6

ii

1

**Statutes**

2   18 U.S.C. § 1956(a)(1) ...................................................................................19

3   18 U.S.C. § 1956(a)(2) ...................................................................................19

    18 U.S.C. § 1956(a)(3) ...................................................................................19

4   18 U.S.C. § 1956(c)(4)(A) ........................................................................ .......19

5   18 U.S.C. § 1957(a) ....................................................................................... 20

    18 U.S.C. § 1957(f)(1) ................................................................................... 20
6
    18 U.S.C. § 3282 ............................................................................................18
7
    18 U.S.C. § 3292 ......................................................................................20, 21
8   18 U.S.C. § 981(g) ................................................................................ passim

    18 U.S.C. § 981(g)(3) ....................................................................................17
9
**Rules**

10  Fed. R. Civ. P. 34 ............................................................................................5

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No.: 22-cv-02902-JLS-PD;
OPPOSITION TO MOTION TO STAY

Claimants Artyom Khachatryan ("Artyom"), Gurgen Khachatryan ("Gurgen"), and WRH, Inc. ("WRH") ("Claimants") hereby file their opposition to the United States of America's ("Plaintiff" or "Government") Motion for an Order to Stay this Civil Forfeiture Proceeding. (Sept. 23, 2022), ECF No. 37 ("Pl. Mot.").

## I.   **INTRODUCTION**

The Government seeks a stay of its own case to indefinitely delay discovery and clog up this Court's docket with a meritless case, in deference to a time-barred criminal investigation that started over three years ago.  As set forth in the Government's Complaint, this circumstantial case concerns a discrete set of simple and transparent financial transactions from more than a decade ago.  The facts and supporting evidence are well known and are not likely to change.  As set forth in Claimants' Verified Answer and Motion for Judgment on the Pleadings, the Government's case was apparently initiated by a referral from Armenian authorities over three years ago. The Government seemingly enjoys the full support and cooperation of the Armenian Government, and the Government has had ample time to complete its investigation. Indeed, as set forth herein, the Government's lead agent and declarant, FBI Special Agent Mark Newhouse ("SA Newhouse"), personally advised at least one witness months ago, in writing, that the Government's investigation was "complete."  After more than three years, the investigation has generated nothing more than the unfounded allegations and circumstantial theories described in the Government's Verified Complaint for Forfeiture In Rem (the "Complaint"), which rests its entire *quid pro quo* bribery theory on purported tax benefits that Armenian courts have already rejected.[1]

On nothing more than these flimsy allegations, the Government has already restrained Claimants' real property, valued at over $50 million, and irreparably harmed the reputations of both individual Claimants, well-known men who have are among the most successful businessmen in Armenia.  Now the Government proposes to continue

---

[1] *See* Claimants' Memorandum of Points and Authorities in Support of Motion for Judgment on the Pleadings at 10-11 (July 7, 2022), ECF 26-1 ("Claimants' MJOP").

1

this harm indefinitely and with minimal accountability.[2]  Staying this case would indefinitely delay Claimants' ability to reclaim control of their property and to clear their names in open court, all the while causing continuing financial and reputational damage to them.

Although stays under 18 U.S.C. § 981(g) may be appropriate in many cases, a stay is inappropriate here.  The Government has failed to meet its burden to show that their criminal investigation is ongoing and that discovery would have an adverse effect on it.  Indeed, the Government's offered justifications are belied by the nature and history of this litigation, as well as its own statements and conduct. The nature of the alleged evidence is known to all parties, the relevant witnesses are readily apparent, and the transactions in question were transparent and not in dispute. There is no risk of loss of evidence or control over the implicated funds.  There is simply no reason to believe that the Government's purported investigation will be harmed if it is required to produce evidence to support its public allegations through normal civil discovery. Nor is there any basis for this Court to accept the Government's novel theory that the law requires a stay based on the outcome of the Armenian proceedings—meritless proceedings that are driven by impure political motivations.

Moreover, even taking the allegations in the Complaint as true, the Government does not have a viable criminal case since any criminal claims they could bring are clearly barred by the statute of limitations.  The Court should therefore deny the Government's motion and allow this case to proceed and merits discovery to begin without further delay.

Finally, even if the Government were able to establish some adverse impact, the more appropriate remedy would be to craft a narrowly tailored protective order that

---

[2] As set forth below, the loans (alleged in the Complaint to be bribe proceeds) of approximately $20 million make up less than half of the total value of Claimants' property. The Government has thus successfully restrained Claimants' use and ownership of their Property, even though there is no allegation of corrupt proceeds concerning other funds that were invested in the Property.

would safeguard the interests of any Government investigation without threatening Claimants' interests in obtaining justice through the speedy resolution of this case. Rather than pause this case and deny Claimants the opportunity to reclaim their property and reputation, the Court could permit Claimants to pursue relevant discovery subject to this Court's oversight, with a protective order in place, if needed.

## II.  <u>BACKGROUND OF THE INVESTIGATION</u>

The Government's investigation began at least as early as November 4, 2019, as evidenced by a grand jury subpoena the Government served on a witness who had been hired by Claimants to assist with development of the Property. *See* Declaration of Peter Thomas ("Thomas Decl."), Ex. A. The 2019 subpoena demands information about the same subjects and entities described in the Complaint, and directs that responsive information be provided to SA Newhouse, the Government's lead agent on the case and the very same declarant relied upon by the Government in its current motion to stay. *See id.* at 3, 4, 7.  The Government appears to have instituted its investigation in coordination with the Armenian authorities, who brought politically motivated charges against Claimants' father, Gagik Khachatryan, just a few months earlier in 2019. Compl. ¶ 34.   Armenian authorities announced its criminal investigation against Claimants Artyom and Gurgen Khachatrian in April 2020.  *See id.* ¶ 35.

After learning that the Government was interviewing witnesses in 2019, Claimants, through then-counsel, attempted to engage with the Government in or around 2020, but that outreach was ignored. In late 2021, after Claimants made the decision to sell the Defendant Property ("Property"), Claimants, through undersigned counsel, again attempted to engage with the Government, this time by contacting leadership at the U.S. Department of Justice's Money Laundering and Asset Recovery Section who then placed counsel in touch with a Supervisory Special Agent with the FBI's Kleptocracy Unit in Los Angeles.   *See* Declaration of Ephraim Wernick ("Wernick Declaration") ¶ 6.  Claimants' counsel sought to be introduced to the prosecutors handling any investigation and indicated that Claimants were prepared to

3

voluntarily provide information to the Government concerning Claimants' ownership of the Property so that any questions could be answered and issues resolved before the Property was marketed for sale. *Id.* ¶ 5. Months later, in or around early 2022, the FBI Supervisory Special Agent told Claimants' counsel that, while he could not confirm or deny the existence of an investigation, the Government had "no reason" to talk with Claimants, and Claimants' counsel then explained that Claimants would then move forward with their sale of the Property. *Id.* ¶ 9.  If the supposed criminal investigation were ongoing at that point in early 2022, to the Government inexplicably rejected the opportunity to obtain highly relevant information directly from apparent targets of their investigation.  Alternatively, if the Government's decision was made because of the evidence already obtained in its investigation, this would have presumably been the opportune time to file a civil forfeiture action, given the impending risk the Property would be sold.  But the Government never objected when they learned of Claimants' intent to sell the Property, *see id.*, most likely because there was no open criminal investigation at the time.

As indicated in the Complaint, Claimants publicly listed the Property for sale in April 2022.  The Government unexpectedly filed its Complaint on May 2, 2022.  After reviewing the Complaint, Claimants' counsel began contacting potential witnesses to conduct fact-gathering interviews and test the Government's theories. One such witness, who had been subpoenaed in the 2019 grand jury investigation, reached out to SA Newhouse (with whom he had not had contact in over two and a half years) to ask whether he could speak with Claimants' counsel.  In response, on June 6, 2022, SA Newhouse told the witness that the "[G]overnment's ***investigation is complete*** and the clients, the clients' attorney, and the world now know we did speak with you."[3] Thomas

---

[3] Claimants will separately apply to file a copy of this email under seal to protect the identity of an innocent witness from undue publicity. A copy of this email exchange has been provided to the Government and Arustamyan. In addition to reflecting that the Government's investigation was complete, SA Newhouse's email also reflects that the Government apparently had required the witness to enter into a nondisclosure agreement ("NDA"). This understandably chilled the witness' interest in speaking with

(Footnote Cont'd on Following Page)

Decl. ¶ 5 (emphasis added). Now, the Government apparently relies on an *ex parte* declaration by Special Agent Newhouse to prove that, contrary to SA Newhouse's own prior statement, "there is an open U.S. criminal investigation related to the allegations in this civil forfeiture case." Pl. Mot. at 6.

At this late stage, the allegations have been known to the parties for years. The criminal charges against Artyom and Gurgen in Armenia are based on the same dubious theory and underlying fact pattern and have been pending since April 2020—over two years before the Government initiated this forfeiture proceeding. In the Government's own words, "the relationship between the foreign criminal proceedings and the civil forfeiture complaint is obvious," Pl. Mot. at 12.   It is likewise apparent that the Government's case was triggered by the Armenian Government, and by all appearances the Government enjoys the benefit of the cooperative foreign administration, which would obviate the need to rely on lengthy and cumbersome foreign evidence requests (*e.g.*, via letters rogatory or mutual legal assistance treaty ("MLAT") processes) to obtain evidence and access to witnesses.  By all accounts, the Armenian Government is more than willing to cooperate with the Government's case, calling into question why, if evidence of actual criminal activity exists, it has not already been developed in the last three years.

Claimants timely filed an Answer to the Complaint shortly after filing their Verified Claim, and the parties are in open discovery while Claimants' Rule 12(c) MJOP is pending.  On July 29, 2022, Claimants served requests for production of documents on the Government pursuant to Federal Rule of Civil Procedure 34. *See* Pl. Mot. Ex. A. The requests are focused and represent a fair attempt to obtain relevant documents needed to defend Claimants' interests in the Property and to rebut the

---

Claimants' counsel. Claimants have noticed similar reluctance from others, raising serious concerns about potential violations of Claimants' fundamental rights to due process and effective counsel under the Fifth Amendments of the Constitution. Claimants have raised these concerns with the Government and requested the Government take action to rectify the problem. Claimants will raise this issue separately with the Court later if the issue is not resolved.

Case No.: 22-cv-02902-JLS-PD;
OPPOSITION TO MOTION TO STAY

spurious allegations made in the Complaint. On September 23, 2022, the Government served its response refusing to produce any documents, relying on its assertion that the proceedings should be stayed indefinitely (though obviously without any order from the Court to that effect).[4] The Government has not attempted to confer with Claimants about ways to narrow the requests to allow discovery to go forward while also protecting purportedly confidential information about the Government's investigation. Instead, the Government proposes an indefinite stay of discovery to prolong the case and clog up the Court's docket, all while continuing to do irreparable harm to Claimants' reputation and their use and enjoyment of their Property. Under the unique circumstances of this case, Claimants respectfully request this Court deny the Government's Motion and allow discovery to proceed.

## III.  <u>LEGAL STANDARD</u>

The law does not afford the Government an automatic stay in civil forfeiture cases. Section 981(g)(1) provides:

> "Upon the motion of the United States, the court shall stay the civil forfeiture proceeding *if the court determines* that civil discovery *will adversely affect* the ability of the Government to conduct a related criminal investigation or the prosecution of a related criminal case."

18 U.S.C. § 981(g)(1) (emphasis added). Under Section 981(g), the Government must actually show an adverse effect on the criminal matter to justify a stay—the mere allegation of a harm is insufficient. *In re Any & All Funds Held in Republic Bank of Arizona Accts. XXXXXXXX, XXXXXXXX, XXXXXXXX, XXXXXXXX, & XXXXXXXX,*

---

[4] The Government's refusal is inappropriate and an abuse of the discovery process; they sought to keep discovery open long enough to obtain responses to their own overbroad Special Interrogatories, only to raise their ungranted motion as a shield when asked to reciprocate. *Apple Inc. v. Eastman Kodak Co.*, No. CV 10-04145 JW PSG, 2011 WL 334669, at *2 (N.D. Cal. Feb. 1, 2011) ("[U]nless and until it is granted a stay, [a party moving to stay discovery] should be required to conduct discovery as if no motion had been filed at all.") (citing *Willemijn Houdstermaatschaapij BV v. Apollo Computer Inc.*, 707 F.Supp. 1429, 1441 (D.Del.1989); *Arriaga v. City of New York*, No. 06 CIV. 2362PKCHBP, 2007 WL 582813, at *1 n. 1 (S.D.N.Y. Feb. 23, 2007)).

774 F. App'x 400, 401 (9th Cir. 2019); *United States v. $1,026,781.61 in Funds From Fla. Cap. Bank*, No. CV 09-04381-JVS ANX, 2013 WL 4714188, at *1 (C.D. Cal. July 29, 2013) ("The Government must make an actual showing regarding the anticipated adverse effect from civil discovery.") (quotations omitted); *United States v. Real Property and Premises*, 657 F. Supp. 2d 1060, 1064 (D. Minn. 2009) ("There is no presumption that civil discovery, in itself, automatically creates an adverse affect [sic] on the Government's related criminal proceeding.") (quoting *United States v. All Funds ($357,311.68) Contained in N. Trust Bank of Fla. Account No. 7240001868*, No. Civ. A. 3:04–1476, 2004 WL 1834589, at *2 (N.D. Tex. Aug. 10, 2004)). Therefore, under Section 981(g), the Government has the burden of establishing (1) the existence of a related criminal investigation or prosecution; and (2) the adverse effect that discovery in the pending case will have on the investigation or prosecution.

The Government cites cases from California district courts in support of its proposition that the Government need only establish that an adverse impact is "likely," rather than certain. *See* Pl. Mot. at 3 (Sept. 23, 2022), ECF No. 37 (citing, *inter alia*, *United States v. $600,980.00 in U.S. Currency*, No. 2:21-cv-06965-RGK-MAR, 2022 WL 2284934 (C.D. Cal. Mar. 8, 2022); *United States v. $1,026,781.61 in United States Currency*, No. CV 09-4381, 2013 WL 4714188, *1 (C.D. Cal. July 29, 2013)). However, the Government's standard contradicts the plain text of Section 981(g) and relevant cases from numerous other districts that have addressed the question. 18 U.S.C. § 981(g)(1) (providing for a stay "if the court determines that civil discovery *will* adversely affect the ability of the Government to conduct a related criminal investigation or the prosecution of a related criminal case") (emphasis added); *see also, e.g.*, *Real Property and Premises*, 657 F. Supp. 2d at 1063-64 ("The Government cannot discharge its burden by claiming that the discovery process could, theoretically, impair the criminal case. If that were true, a stay would be appropriate whenever requested by the Government in a civil-forfeiture action . . . ."); *United States v. $3,592.00 U.S. Currency*, No. 15-cv-6511, 2016 WL 5402703, at *1 (W.D. N.Y. Sept.

7

28, 2016) ("Importantly, the Government's burden is not simply to show that civil discovery *could* adversely affect the criminal case, but to show that civil discovery *will* adversely affect the criminal case.") (emphasis in original); accord *United States v. $68,145.34 in Bellco Credit Union Bank Account #XXXXXXX*, No. 18-cv-03208, 2020 WL 353115, at *4 (D. Colo. Jan. 17, 2020); *United States v. Currency $716,502.44*, No. 08–CV–11475, 2008 WL 5158291, at *4 (E.D. Mich. Dec. 5, 2008) ("Neither the fact that the Government would be subject to civil discovery, nor bare assertions of hardship by the Government, are enough to satisfy the statutory standard."). The correct standard is that the Government must show that discovery will *actually have an adverse effect* on the related criminal matter.[5] The Government's mere speculation that discovery may impact a criminal investigation is not sufficient to justify a stay. *See, e.g.*, *Real Property and Premises*, 657 F. Supp. 2d at 1063-64.

Even in cases where the Government meets its burden, however, the Court need not wield a sledgehammer when a scalpel will do—instead of a stay, this Court may issue a protective order that adequately safeguards the Government's interests while permitting Claimants to pursue the civil forfeiture case. 18 U.S.C. § 981(g)(3); *see, e.g.*, *United States v. $177,844.68 in U.S. Currency*, No. 2:13-CV-00100-JCM, 2015 WL 355495, at *7 (D. Nev. Jan. 27, 2015) (denying the Government's motion to stay and ordering the parties to confer as to an appropriate protective order to protect against disclosure of confidential information about a parallel criminal investigation); *United States v. Sum of $70,990,605*, 4 F. Supp. 3d 209, 214 (D.D.C. 2014) (finding that "a well-crafted protective order limiting discovery could 'protect the interest' of the government while preserving the ability of the claimants to pursue the civil case").

---

[5] Section 981(g) also requires that it be the discovery itself that creates the adverse impact. Accordingly, the parties agree that there is no reason for this Court not to continue with the hearing set for October 28, 2022 and resolve Claimants' pending Rule 12(c) Motion for Judgment on the Pleadings. *See* Pl. Mot. at 1 n.1.

## IV.   THE GOVERNMENT'S WORDS AND ACTIONS RAISE SIGNIFICANT DOUBTS ABOUT THE EXISTENCE OF AN ONGOING INVESTIGATION

The Government opened its investigation at least three years ago. By November 4, 2019, the Government had convened a grand jury, started interviewing witnesses, and had issued at least one subpoena. *See* Thomas Decl., Ex. A.  Claimants learned about the Government's inquiries and Claimants' then-counsel attempted to contact the law enforcement agents at the time to no avail.  In late 2021, as Claimants prepared to sell the Property, Claimants' counsel attempted to contact the Government to voluntarily offer information, but the Government declined the opportunity discuss any concerns with Claimants, even when informed of Claimants' intent to sell the Property. Wernick Decl. ¶ 9.  And in June 2022, Special Agent Newhouse stated in writing  that the "[G]overnment's ***investigation is complete***," and disclaimed any concern that a witness in the grand jury investigation would be speaking with Claimants' attorneys.[6] Thomas Decl.  ¶  5  (emphasis added).  This statement likely contradicts the representations in SA Newhouse's *ex parte* declaration that the Government has offered to support its assertion that "there is an open U.S. criminal investigation related to the allegations in this civil forfeiture case." Pl. Mot. at 6.  Given SA Newhouse's contradictory statements undercut the entire basis of the Government's argument for a stay, this Court has ample reason for skepticism and should deny the Government's Motion.[7]

---

[6] As noted above, Claimants will separately apply to file a copy of this document under seal to protect the identity of the witness.

[7] The Government's filing of an *ex parte* declaration is permissible but obviously places Claimants at a significant information imbalance and disadvantage. Under the circumstances, Claimants respectfully request this Court closely scrutinize the Government's purported rationale for a stay and require the Government to provide specific information about the documents and evidence that it seeks to obtain and the time it should take do so. Under the circumstances of this very old case and the draconian measures that have already been taken to restrain Claimants' Property and the reputational damage that has already been done, Claimants have no ability at this stage to challenge the Government's *ex parte* assertions. This Court is uniquely positioned to hold the Government accountable.

9

## V. THE GOVERNMENT CANNOT SHOW AN ADVERSE IMPACT

In addition to failing to show the existence of an ongoing investigation, the Government cannot make an "actual showing regarding the anticipated adverse effect from civil discovery." *$1,026,781.61 in Funds*, 2013 WL 4714188, at *1. The Government has not demonstrated any adverse impact to any pending criminal investigation or proceeding, or even that such an impact is "likely." This matter has been under investigation for at least three years, both in Armenia and in the United States. The Government's allegations are public and the relevant theory and underlying facts are simple and well known to the parties. As a result, the Government's production of documents relevant to its existing claims is highly unlikely to impact any ongoing investigation even if one were to exist.

The Government's motion advances three speculative arguments to support its theory of harm: (A) that discovery "would likely" cause "targets of the investigation to change channels for moving illicit funds" or "destroy or conceal evidence"; (B) the general principle that civil discovery is broader than criminal discovery; and (C) that the Government would be required to expose its strategy, evidence, asset tracing, and witnesses. The Government also raises a novel argument, unsupported by Section 981(g) or relevant case law, that the pending criminal proceedings in Armenia are a sufficient basis to grant a stay. Each assertion is meritless and ignores the actual circumstances of this case. As a result, Claimants respectfully request this Court deny the Government's Motion, or at minimum, craft an appropriately tailored protective order that will allow discovery concerning the allegations in the Complaint to proceed without impacting the Government's investigation into tangential matters.

### A. Civil discovery will not cause "illicit" funds to change channels or result in spoliation.

The assets at issue in the forfeiture action are known and accounted for, and indeed consist of only one parcel of real estate that is the Defendant Property. While it is common in other forfeiture cases to have a complex web of shell entities funneling

10

millions in illegal funds across multiple jurisdictions, this is no such case.  Indeed, the only asset identified in the Complaint as allegedly tainted by criminal misconduct is the Property, which is already the subject of a Court-approved interlocutory sale stipulation between the Government and Claimants. *See* Stip. for Order Auth. Interloc. Sale (Aug. 23, 2022), ECF No. 33; Order Auth. Interloc. Sale (Aug. 29, 2022), ECF No. 36.  The Stipulation provides that the proceeds of any Court-approved sale would be placed in the Seized Asset Deposit Fund under the custody of U.S. Marshal Service, subject to the outcome of this litigation. Stip. For Order Auth. Interloc. Sale ¶ 16 (Aug. 23, 2022), ECF No. 33.  This includes over $50 million of anticipated sale proceeds— far more than the $20 million in allegedly tainted funds the Government seeks to safeguard.

Indeed, the allegedly tainted funds used to purchase the Property are fully accounted for. The Government's circumstantial case is built on the hollow theory that a $13.4 million personal loan from Sedrak Arustamyan to Claimants was actually a bribe to Claimants' father. There is no question as to where the $13.4 million in funds went, however, as by the Government's own allegations, the full amount of the personal loan was transparently transferred directly to either the escrow company involved in the sale, or Claimants' trust before being wired to the escrow company. Compl. ¶¶ 41-44. The Complaint does not identify any assets, other than the Property, that are allegedly comprised of illicit funds and subject to U.S. jurisdiction.  Nor can Plaintiffs allege any efforts by Claimants to conceal the movement of funds here.

Moreover, even if the Government's *ex parte* declaration purports to identify assets, funds, or investigation targets beyond the scope of the forfeiture action, the Court can safeguard such evidence from civil discovery by a protective order. Claimants at this stage only seek discovery concerning the Government's allegations in the Complaint about the Property itself. A protective order would sufficiently and simply protect against disclosure of any purported evidence relating to other alleged matters. For example, such an order could permit discovery of supporting documents

11

for the Government's already-public allegations, provide for the redaction or restriction to attorneys'-eyes-only of information the Government can show would harm an ongoing tangential investigation, or identify particular documents *in camera* that could be withheld from production. Any or all of these less extreme alternatives are available and more appropriate than the blanket and indefinite stay the Government seeks in this case.

Further, civil discovery does not create or elevate the risk of evidence spoliation, particularly given Claimants' knowledge of the Government's investigation since 2019. Claimants have been aware of an investigation by Armenian authorities into their alleged misconduct concerning the exact same allegations for years, as well. Whatever evidence the Government hypothesizes to be under Claimants' control is therefore not under some new or unique risk of spoliation because of civil discovery in this forfeiture action. If Claimants were going to destroy evidence (which they would not do), the risk of that happening passed long ago.  On the contrary, Claimants *welcome* discovery concerning the Property, and indeed have indicated they have no intention of asserting their Fifth Amendment right against self-incrimination during civil discovery, as it is their Constitutional right to do. *See* Joint Rule 26 Report at 10 (Aug. 12, 2022), ECF No. 30.[8] And again, whatever concerns the Government has regarding potential spoliation of evidence or of disclosure of purported evidence outside the scope of this case can be safeguarded with a protective order.

**B.    The general principle of early or extra access to evidence does not warrant a stay here.**

The Government asserts "the central question" in its adverse harm-showing is whether civil discovery will subject the Government to earlier and broader disclosures than a hypothetical criminal proceeding. Pl. Mot. at 2. First, the Government has only

---

[8] In fact, in response to the Government's Special Interrogatories, Claimants have encouraged the Government to proceed with discovery and issue Rule 33 interrogatories to properly request information sought by the Government's overbroad Special Interrogatories.

identified an allegedly ongoing "investigation," not a proceeding, and that investigation has been going on for at least three years. In reality, there is nothing "early" about the discovery being sought by Claimants here. The Government asks this Court to indefinitely delay discovery, tying up more than $50 million of assets, in deference to a case it may never bring (and, as stated below, that the Government legally cannot bring) and had ample opportunity to bring already.  This Court should reject such a request.

Moreover, the justification for a stay cannot simply rest on the principle that civil discovery is broader than criminal discovery. This is true for *every single* case, and would remove any and all deference to the Court's judgment. The argument would transform Section 981(g) into an automatic stay whenever a related criminal investigation exists. As other courts have recognized, "[t]here is no presumption that civil discovery, in itself, automatically creates an adverse affect [sic] on the Government's related criminal proceeding." *Real Property and Premises*, 657 F. Supp. 2d at 1064 (quoting *All Funds ($357,311.68) Contained in N. Trust Bank of Fla. Account No. 7240001868*, 2004 WL 1834589, at *2). The Government's "bare assertions of hardship" caused by civil discovery are not sufficient to meet its burden under Section 981(g). *Currency $716,502.44*, 2008 WL 5158291, at *4.  Instead, the Government must show that civil discovery would have an actual adverse impact on their investigation, *beyond* the Claimants' mere access to discovery earlier than would be possible if there were a criminal investigation but no forfeiture case.  These are necessarily factually driven determinations for the Court to make, based on the specific circumstances of the case at hand.  Based on what is publicly known (and much has been revealed in the Government's Complaint) the risk of civil discovery harming the Government's purported investigation is illusory.

**C.     The Government's case is simple and already known to Claimants, eliminating the likelihood of any adverse impact.**

Case No.: 22-cv-02902-JLS-PD;
OPPOSITION TO MOTION TO STAY

As the Government acknowledges, the forfeiture action and their purported investigation "are clearly related." Pl. Mot. at 12. The Complaint expressly identifies the Government's criminal theories, the transactions on which it is relying, the entities and individuals it believes to be involved, and the circumstantial evidence alleged to support those theories—all laid bare for the world and Claimants to see.

The case is straightforward. The Government alleges that personal loan agreements between Claimants and Arustamyan were shams designed to conceal bribes to Claimants' father. Compl. ¶¶ 21-22. It then alleges funds from those loan agreements were used to purchase the Property—having easily traced the transparent transactions directly from Arustamyan to the real estate escrow account, and the chain of the Property's ownership by different lawful investment vehicles over the years through the Claimants' transparent public filings. Compl. ¶¶ 38, 41-44, 52-53; *see generally* Verified Claim of Artyom Khachatryan, Gurgen Khachatryan, and WRH, Inc. (June 16, 2022), ECF No. 11 ("Verified Claim"). The loan documents and transfer records are not in dispute, and many of these documents are already in the record. *See* Verified Claim, Exhibits A-D; Answer and Aff. Defs. of Claimants Artyom Khachatryan, Gurgen Khachatryan, and WRH, Inc., Exhibits A-E (July 7, 2022), ECF No. 25 ("Answer"). This case bears none of the hallmarks of a typical international corruption case: there are no complicated movements of funds, no shell companies or nominees, no veiled transactions to disguise beneficial ownership—nothing similar to the numerous cases cited by the Government in support of its Motion. Pl. Mot. at 8-9. This case is about whether the personal loan agreements between Claimants and Arustamyan and the transparent financial transactions that followed should be interpreted as bribes or not. It is as simple as that.

Claimants are already aware of the potential witnesses involved. Indeed, the Government *asked Claimants* to identify the potentially relevant witnesses in the

Special Interrogatories propounded in this case.[9] Thomas Decl. Ex. B at 21-22, 24, 26, 32-33, 38, 40, 48-49, 51, 53. Claimants should be entitled to conduct their own investigative interviews, request and review documents, and take depositions of pertinent witnesses who may have information relevant to Claimants' defense. Under the circumstances here, a stay would unfairly limit Claimants' rights.

Further, the Government has made no effort to safeguard its investigative theories, which are detailed in the Complaint. To support its circumstantial corruption theory, the Government alleges only the known familial relationship between the Claimants and their father, and makes naked allegations concerning a purportedly corrupt relationship between Arustamyan and Claimants' father. The Government then inexplicably relies on now-overturned tax actions that were supposed to support the theory that Claimants' father conveyed a corrupt benefit to Arustamyan. Compl. ¶¶ 32-33. Not only did the Armenian courts determine there was no basis for finding any improper benefit was ever conveyed, *see* Claimants' MJOP, Exhibits J-L, the Government's theory lacks any temporal link to the loans between Arustamyan and Claimants. The purported tax benefits did not occur until six years after the loan transactions, and were purportedly conveyed to Arustamyan in the years *after* Claimants' father had already left office. *See* Claimants' MJOP at 11, 20. The Complaint also reveals the Government's theories about the purported design and purpose of the Property, which the Government baldly claims demonstrates corrupt intent.

---

[9] Moreover, the Government's Special Interrogatories reveal precisely the type of evidence the Government is trying to develop. The Government's Special Interrogatories demand a significant amount of unrelated information outside the scope of Rule G. Among other things, the Government has demanded an accounting of every dollar used to make improvements on the Property after it was acquired; the specific banks and account numbers for each transaction; Claimants' residence status and all identification cards, passports, and visas, information about other (non-Claimant) individuals and entities (identified by name) with no relationship to the Property; and details of individuals who allegedly visited the Property. Thomas Decl. Ex. B at 20, 24, 34, 38, 51. The Government's attempt at one-sided merits discovery while simultaneously moving to stay discovery creates a strikingly unjust imbalance.

A stay may be appropriate where, for example, the Government has developed confidential informants or information, but there is no reason to believe such witnesses or information exist here. *See e.g., United States v. $177,844.68 in U.S. Currency*, Nos. 2:13–cv–00100–JCM–GWF, 2:13–cv–00947–JCM–GWF, 2015 WL 355495, at *7 (D. Nev. Jan. 27, 2015) (denying the Government's request to stay a forfeiture case, and emphasizing that "there does not appear to be any need for the Government to disclose the identities of confidential informants or other confidential information that has been or is being developed during ongoing criminal investigations. The disclosure of such information can also be guarded against by a protective order."). The Complaint does not even allege the existence of other evidence (such as known communications) to demonstrate corrupt dealings between Arustamyan and Gagik Khachatryan, or any basis for believing Gagik had a role in the tax determinations for the relevant entities. Indeed, the Government was *required* to state such "sufficiently detailed facts" in its Complaint. Fed. R. Civ. P. Suppl. R. G(2)(f).  If such evidence exists, one would expect it to have surfaced by now, after three years of investigation with full cooperation from a supportive Armenian Government.  Even still, a protective order would be more appropriate than halting the entirety of discovery and indefinitely tying up Claimants' Property with this forfeiture action.

### D.     This Court should reject the Government's novel claim that ongoing Armenian proceedings should provide a shield against discovery.

Finally, the Government presents a novel claim that Section 981(g) provides a statutory basis to stay discovery pending the outcome of the ongoing criminal case in Armenia. The Government posits that the phrase "adversely affect the ability of the Government to conduct a related criminal investigation or the prosecution of a related criminal case" draws a distinction between a criminal investigation (which must be conducted by "the Government") and the prosecution of a related case (by any Government in any forum across the globe). The Government's interpretation is at odds with the plain language of the statute and lacks any precedential support.

Case No.: 22-cv-02902-JLS-PD;
OPPOSITION TO MOTION TO STAY

The text of Section 981 is unambiguous: a stay is appropriate where the Government shows that civil discovery will "adversely affect the ability of the Government to conduct" either (1) "a related criminal investigation" or (2) "the prosecution of a related criminal case." 18 U.S.C. § 981(g)(1). To read the statute otherwise would have the unintended and perverse effect of permitting the Government to indefinitely stay a U.S. civil forfeiture proceeding in deference to a tangentially related foreign prosecution, even where there was no criminal case being pursued in the United States. Further, Section 981(g)(3) contemplates the Court's ability to enter a protective order where a stay is unnecessary where the order would protect the interests of "one party" without unfairly preventing the "opposing party" from pursuing civil discovery. *Id.* § 981(g)(3). This reference to the interests of each "party" plainly indicates that Section 981 is only concerned with the interests of parties to the case, not non-parties or foreign Governments.[10]

Moreover, Claimants are not seeking "backdoor" evidence being relied on by the Armenian Government. As is the case with the US proceedings, the nature of the evidence and related witnesses are already public because the current Armenian regime has taken every opportunity to publicize the allegations for political gain. Among other things, Claimants seek communications between the Armenian authorities and the Government to discover exculpatory evidence and impeachment material that will be helpful in Claimants' forfeiture case. There is no basis for using Section 981(g) as a shield for that information.

## VI.   THE STATUTE OF LIMITATIONS BARS ANY CRIMINAL ACTION, SO THERE IS NO POTENTIAL CRIMINAL CASE FOR THE GOVERNMENT TO BRING

---

[10] Even under the Government's strained reading of Section 981, Plaintiff acknowledges that a pending investigation that falls short of a criminal proceeding must be the province of the US Government. Notably, in Armenia, being "charged" is akin to being publicly "investigated"—unlike the United States, it is routine practice in Armenia and other countries for a government to announce that an individual is under investigation.

Any criminal case the Government could have brought under the facts alleged in this proceeding is now time-barred by the relevant statute of limitations period.  As a result, the Government cannot suffer any prejudice if civil discovery proceeds because, as a matter of law, the Government has no viable criminal case to bring.

Among the many other deficiencies in its theory, the Government has not identified any alleged criminal conduct within the relevant five-year statute of limitations period that would govern a criminal case here. *See* 18 U.S.C. § 3282.  More than five years have passed since the purportedly corrupt conduct alleged in the Complaint. The two loan agreements, including the loan used to purchase the Defendant Property, and the associated payments identified in the Complaint were completed in 2009 and 2011 respectively, *see* Compl. ¶¶ 23, 26, 41-44, well over a decade ago. Gagik Khachatryan left his role as the Armenian Minister of Finance on or about September 8, 2016, *see* Compl. ¶ 19, and from that point could no longer provide the alleged *quid* (preferential treatment) in exchange for a *quo* (the alleged bribes). Therefore the alleged bribery scheme would have necessarily concluded over six years ago. *See generally United States v. Kozeny*, 638 F. Supp. 2d 348, 355 (S.D.N.Y. 2009) ("It would be reasonable to conclude that the conspiracy ended when [the defendant and his co-conspirators] abandoned their attempts at [the business venture that benefitted from bribery] or when they ceased paying bribes to [foreign] officials.").

The alleged money laundering scheme would have ended even earlier. The Government alleges that the loan agreements between Arustamyan and Claimants were "shams" designed to conceal bribes, Compl. ¶ 22, but the objective of the alleged conspiracy would have been completed at the time the funds were disbursed. Even under the most generous reading of the Government's allegations, the latest action in furtherance of the alleged concealment using "sham" loan agreements would have been

the second loan agreement's amendment, dated July 7, 2016, to extend the repayment period.[11] This too falls well outside the statute of limitations period.

Further, the Complaint does not identify any alleged conduct within the statute of limitations period that would support a substantive money laundering charge under Section 1956. An essential element of Section 1956(a)(1) and 1956(a)(3) money laundering is that the defendant engaged in a "financial transaction," which is defined to include "a transaction which in any way or degree affects interstate or foreign commerce . . . involving the transfer of title to any real property," as well as wire transfers, transactions involving monetary instruments, and transactions involving financial institutions. 18 U.S.C. § 1956(c)(4)(A). The Government has alleged no such transaction within the past five years. All of the wire transfers identified in the Complaint took place in 2011, *see* Compl. ¶¶ 41-44, and the most recent transfer of title of the defendant Property occurred on or around May 13, 2016, *see* Compl. ¶ 52. In all instances, the alleged "financial transactions" took place more than five years ago.[12] Likewise, Section 1956(a)(2) requires the transfer of a monetary instrument or

---

[11] Once the objective of a conspiracy is accomplished, later acts of concealment generally do not extend the life of a conspiracy. *See Grunewald v. United States*, 353 U.S. 391, 401-02 (1957). The question of whether acts of concealment further a conspiracy depends on the alleged object of the conspiracy, and whether concealment in the manner alleged is an object of the conspiracy. *See United States v. Walker*, 653 F.2d 1343, 1345 (9th Cir. 1981). Here, the object of the alleged conspiracy between Arustamyan, Gagik Khachatryan, and Claimants, as described in the Complaint, was bribery and the concealment of the alleged bribes through "sham" loan agreements. As these objective would have been completed when the funds were transferred pursuant to the loan agreements and when Gagik left office, the latest conduct alleged by the Government in arguable furtherance of the conspiracy was in 2016 when the loan agreements were last amended, and therefore outside the statute of limitations period. Under *Grunewald*, any separate later acts of purported concealment unrelated to the loan agreements would not serve to further the original alleged conspiracy, and would therefore not extend the statute of limitations period. *See, e.g.*, Comp. ¶ 37.

[12] While the pending sale of the Property pursuant to the interlocutory order entered by this Court would qualify as a "financial transaction" because it involves, *inter alia*, the transfer of title to real property, the other essential elements would not be met to

(Footnote Cont'd on Following Page)

Case No.: 22-cv-02902-JLS-PD;
OPPOSITION TO MOTION TO STAY

funds to, from, or through a jurisdiction outside the United States, and the most recent transaction meeting these criteria that the Government has identified in the Complaint took place in 2011. *See* Compl. ¶¶ 41-44. Therefore, the Government has not identified any conduct to establish a violation of Section 1956 money laundering within the statute of limitations period.

Similarly, the Government's Complaint does not allege any conduct to establish a money laundering offense in violation of Section 1957. An essential element of that statute is that a defendant engage in a "monetary transaction," which is defined as a "deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce, of funds or a monetary instrument . . . by, through, or to a financial institution . . . ." 18 U.S.C. § 1957(a), (f)(1). As noted above, the Government has not alleged any such transaction within the statute of limitations period. The only such transactions identified by the Government took place in 2011. *See* Compl. ¶¶ 41-44.

On the face of the Government's Complaint, therefore, there is no criminal case that the Government could bring that is not time-barred by the applicable statute of limitations period.[13] As such, this Court should deny the Government's Motion and allow discovery to proceed.

---

constitute a violation of Section 1956 because the transaction was conducted transparently with the involvement of this Court and the Government. Further, the Government was notified by counsel of Claimants' intent to sell the Property months before it was publicly listed for sale and did not object at the time. *See* Wernick Decl. ¶ 9; Compl. ¶ 54.

[13] The Government generally is allowed to toll the relevant limitations period up to three years pending the receipt of foreign evidence that would advance an investigation before indictment. *See* 18 U.S.C. § 3292. Notwithstanding the Government's cozy relationship with Armenian authorities here, the Government alleges here that it needs additional time to send formal requests for discovery from foreign governments. Presumably, the Government has not yet filed such a formal request for assistance or submitted a request to toll discovery under Section 3292, or has only done so recently, after the statute of limitations period had already expired. The submission of a formal request to the Armenian government at this stage, followed by a request to toll under Section 3292 would not revive time-barred claims. *See United States v. Jenkins*, 633 F.3d 788, 799 (9th Cir. 2011) (noting that an "official request for evidence in a foreign country be made before the statute of limitations expires"). In addition, Section 3292 presents an opportunity for mischief and pretextual requests, especially when seeking evidence from a friendly and cooperative foreign Government. If the Government

(Footnote Cont'd on Following Page)

20

## VII.   THE GOVERNMENT'S ACTIONS MERIT CLOSE SCRUTINY

For the reasons above, the Government has failed to meet its burden under Section 981(g) to justify a stay of discovery here. At most, this case may merit a protective order if supported by the Government's *ex parte* evidence. The scope of any such protective order can be determined following a meet and confer between the parties.

Even if the Court finds that the Government has met its burden and this case merits a stay, however, Claimants respectfully request that this Court hold the Government accountable and require the Government to make specific factual showings and document progress in its investigation to justify any continued stay. The Government's investigation began over three years ago. The Government is working alongside a very cooperative Armenian Government. The Government's lead agent has made statements that the Government's investigation is "complete," which undercuts the Government's rationale for a stay. The Government's forfeiture action is based on circumstantial theories unsupported by the facts and law, and every day that passes causes continued injury to Claimants' reputation and use of their Property.  Under the circumstances, this Court should closely supervise the Government's progress in any purported criminal investigation to ensure that any stay is not extended beyond the minimum time needed to mitigate the ongoing harm to Claimants' reputation and rights here.

The Government requests a stay with periodic status reports every 180 days, but such a lengthy period is entirely inappropriate given the facts of this case, and it would allow this years-long matter to lag even further. Recent forfeiture cases from this district required the Government to provide status reports every 90 days.  *See, e.g.,*

previously filed a Section 3292 request to toll the limitations period in this case, such a request should be closely scrutinized to ensure that the Government's request for foreign evidence was submitted prior to the lapse of the statute of limitations period and was not intended to toll the limitations period for the sole purpose of giving the Government even more time to investigate this matter.

21

*United States v. $341,500.00 in U.S. Currency*, No. 221CV06967RGKMAR, 2022 WL 2285659, at *3 (C.D. Cal. Mar. 8, 2022). Here, a shorter time frame is merited, and the Government should be required to show substantial progress before any extension of a stay is entertained.  Claimants therefore respectfully request that, if this Court agrees to a stay, then the Government be required to submit a report to the Court within 60 days to prove to the Court that the Government is promptly advancing its long-running investigation.

## VIII.  <u>CONCLUSION</u>

For the reasons stated above, Claimants respectfully request this Court deny the Government's motion to stay this case.  Alternatively Claimants respectfully request this Court allow civil discovery concerning the Government's allegations in the Complaint to proceed under a narrowly tailored protective order, the scope of which to be determined in consultation with the parties. If the Court does grant the Government's motion, then Claimants respectfully request the Government submit a report within 60 days to ensure that the Government is taking sufficient efforts to progress its case so that the stay may be lifted and discovery can proceed as quickly as possible.

Dated: October 7, 2022

VINSON & ELKINS LLP


By: <u>/s/ *Ephraim Wernick*</u>
Ephraim Wernick
Christopher W. James
Peter T. Thomas

*Attorneys for Claimants Artyom Khachatryan, Gurgen Khachatryan, and WRH, Inc.*

Case No.: 22-cv-02902-JLS-PD;
OPPOSITION TO MOTION TO STAY